UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| TINA MARIE BIRD, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 14-30108-MGM |
| CAROLYN W. COLVIN, | * | |
| Acting Commissioner of Social Security, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION
FOR JUDGMENT ON THE PLEADINGS AND DEFENDANT'S MOTION
FOR ORDER AFFIRMING THE DECISION OF THE COMMISSIONER
(Dkt. Nos. 12 and 20)

September 11, 2015

MASTROIANNI, U.S.D.J.

I.      INTRODUCTION

This is an action for judicial review of a final decision by Carolyn Colvin, the Acting

Commissioner of the Social Security Administration ("Commissioner"), regarding an individual's

entitlement to Social Security Disability Insurance ("SSDI") benefits pursuant to 42 U.S.C. § 405(g)

and Supplemental Security Income ("SSI") pursuant to 42 U.S.C. § 1383(c)(3) (referencing 42 U.S.C.

§ 405(g)).  Tina Marie Bird ("Plaintiff") asserts the Commissioner's decision denying her such

benefits—memorialized in a March 19, 2013 decision of an administrative law judge ("ALJ")—is in

error.  She has filed a motion for judgment on the pleadings and the Commissioner has moved to

affirm.

For the following reasons, the court will deny Plaintiff's motion for judgment on the

pleadings (Dkt. No. 12) and allow the Commissioner's motion to affirm (Dkt. No. 20).

## II.   BACKGROUND

Plaintiff was born on October 21, 1971.  (Administrative Record ("A.R.") at 61.)  She has a high school education, her past employment includes work as an order filler, a waitress, and a candle maker, and she last worked in February, 2009.  (Id. at 37, 57-58.)  Plaintiff has a history of mental disorders, including major depressive disorder, anxiety, obsessive-compulsive disorder, and alcohol dependency in remission.  (Id. at 36.)  She also has a history of physical impairments, including De Quervain's tenosynovitis and carpal tunnel syndrome in both wrists, osteoarthritis in various joints, and asthma.  (Id. at 20-21, 422-24.)  Plaintiff also suffers from dyslexia.  (Id. at 43, 45-46.)  Plaintiff was 39 years old when she applied for SSI and SSDI benefits on April 1, 2011.  (Id. at 61, 74.)  Plaintiff claimed she was disabled beginning February 9, 2009, when she was 37 years old, due to "depression, anxiety, dyslexia, alcohol abuse, [and] pain in wrists."  (Id. at 61, 74.)  After Plaintiff's applications were denied both initially and upon reconsideration, she requested a hearing in front of an administrative law judge.  (Id. at 73, 86, 109, 128, 147, 149.)

A.  Medical Evidence in the Administrative Record[1]

Plaintiff's medical records indicate that she attended psychotherapy sessions with Nancy Kirk, LICSW, from August, 2005 through May, 2009.  (Id. at 427.)  In conjunction with this psychotherapy, Plaintiff was treated by George Kriebel, M.D., who diagnosed her with depressive disorder and noted that she had "long-standing and ongoing depression."  (Id. at 488-90.)  The majority of this treatment took place before Plaintiff's claimed disability onset date of February 9, 2009.  (Id. at 13.)  Plaintiff was incarcerated for five months in 2010 for driving under the influence and was released on July 21, 2010.  (Id. at 317.)  Soon thereafter, Plaintiff began seeing Mary Lutkus, LICSW, for psychotherapy.  Ms. Lutkus first met with Plaintiff on August 2, 2010 and diagnosed her

---

[1] In this appeal, Plaintiff does not challenge the ALJ's findings regarding her physical impairments, and only focuses on her mental health impairments.  Accordingly, the court generally limits its discussion to evidence regarding such mental health impairments.

with major depressive disorder, recurrent – moderate.  (Id. at 321-22.)  Ms. Lutkus gave Plaintiff a

Global Assessment of Functioning ("GAF") score of 56[2] on this date.  (Id. at 322.)  Ms. Lutkus

devised a plan for Plaintiff to decrease her symptoms of depression and anxiety, and reported on

November 16, 2010 that Plaintiff had achieved 15% of her goal while assessing a GAF score of 57.

(Id. at 327, 329-30.)  On April 7, 2011, Ms. Lutkus wrote a letter to the Commissioner stating that

Plaintiff "is stable, but the depth of her depression and anxiety would impede her ability to function

successfully in a regular job."  (Id. at 425.)

On July 5, 2011, at the request of the Massachusetts Disability Determination Services

("DDS"), Douglas Williams, Psy.D., examined Plaintiff.  Dr. Williams stated that Plaintiff reported

"mild to moderate symptoms of depression," but presented "no signs of psychotic thinking or other

severe mental illness."  (Id. at 465.)  Dr. Williams reported a diagnosis of major depressive disorder,

recurrent – moderate, and a GAF score of 60.  (Id.)  According to Dr. Williams, Plaintiff

demonstrated "relative difficulties with concentration, persistence, and pace," but he also noted that

Plaintiff "has been able to work successfully in the past."  (Id. at 465-66.)

On July 27, 2011, J. Litchman, Ph.D., a DDS staff psychologist, reviewed Plaintiff's record

in order to make a disability determination.  Dr. Litchman determined that Ms. Lutkus's conclusion

that Plaintiff had "significant limitations" was neither supported by the case notes nor by the

findings from Dr. Williams's evaluation.  (Id. at 67.)  Dr. Litchman gave Dr. Williams's findings

more weight than those of Ms. Lutkus, which were given "low weight" because the conclusions

were "not supported by [the] longitudinal record or consultative examination findings."  (Id. at 67-

68.)  Additionally, Dr. Litchman found that Plaintiff's statements regarding her symptoms were

---

[2] A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning."  Diagnostic and Statistical Manual of Mental Disorders, Fourth Ed., Text Revision, 32 (2000).  A score between 51 and 60 denotes "moderate" symptoms or limitations.  Id. at 34.  A score between 41 and 50 denotes "serious" symptoms or limitations.  Id.

"partially credible" and "only partially supported by [Plaintiff's] own assertions in the consultative examination and consultative examination findings." (Id. at 68.) Finally, Dr. Litchman found that while Plaintiff was "moderately limited" in her ability to maintain concentration for extended periods, complete a normal workday, and interact appropriately with the general public, Plaintiff would be able to maintain concentration on simple tasks, sustain "schedule, persistence, and pace" in simple two-step routines, and "handle brief interactions" with coworkers. (Id. at 70-71.) Reviewing the record, Robert McGan, M.D., a DDS staff physician, acknowledged that Dr. Litchman's findings were less restrictive than those of Ms. Lutkus, but stated that Ms. Lutkus's opinion "relies heavily on the subjective report of symptoms and limitations provided by the individual, and the totality of the evidence does not support the opinion. The opinion contrasts sharply with the other evidence in the record, which renders it less persuasive." (Id. at 71.) Based on these findings, Dr. McGan made a determination of "not disabled." (Id. at 73.)

On October 7, 2011, upon Plaintiff's request for reconsideration of the initial denial of her applications, Celeste Derecho, Ph.D., a DDS staff psychologist, reviewed the record and newly submitted evidence. Plaintiff stated in her request for reconsideration that her depression had become worse, making her not want to do everyday tasks, and that her anxiety caused her to stay at home due to her discomfort being around other people. (Id. at 93.) Plaintiff submitted her then-latest treatment plan from Ms. Lutkus, dated September 1, 2011, as evidence in support of her claim. (Id. at 99-101, 476-80.) Dr. Derecho found, however, that the treatment plan "describe[d] similar symptoms as in previous treatment plans" and contained "no indication of worsening of symptoms." (Id. at 103.) Based on these updated findings, Erik Purins, M.D., a DDS staff physician, made a determination of "not disabled." (Id. at 109.)

Following the denial of her disability applications, Plaintiff continued to receive treatment with Ms. Lutkus. On December 1, 2011, Ms. Lutkus noted that Plaintiff had achieved 20% of her

therapeutic goals (a slight increase over the 15% noted in previous meetings), but also stated that

Plaintiff's symptoms "have worsened over time and as more stressors have occurred in her life."

(Id. at 516.)  Ms. Lutkus gave Plaintiff a GAF score of 52 on this date, compared to a previous high

of 57.  (Id. at 513.)  On May 21, 2012, Ms. Lutkus marked a slight upgrade, to 25%, in Plaintiff's

progress towards the goal of reducing depression and anxiety symptoms, but echoed previous

comments that Plaintiff's symptoms had worsened over time.  (Id. at 556.)  On November 19, 2012,

Plaintiff met with Kent Hesse, M.D., a psychiatrist who worked with Ms. Lutkus.  Dr. Hesse

indicated that Plaintiff had not suffered any "acute changes" since beginning treatment at the clinic,

found that Plaintiff had "a mildly anxious attitude, without agitation," and stated that Plaintiff's

"history and presentation are consistent with . . . moderate to mild depression."  (Id. at 625-27.)  Dr.

Hesse also stated that Plaintiff described "mild obsessive-compulsive traits."  (Id. at 627.)  On

December 3, 2012, Ms. Lutkus's progress notes stated that Plaintiff's anxiety symptoms "have

recently begun to worsen to the point that a diagnosis of generalized anxiety disorder has been

added to illustrate the magnitude of her anxiety."  (Id. at 624.)  On January 3, 2013, Ms. Lutkus gave

Plaintiff a GAF score of 50.  (Id. at 618.)  On January 11, 2013, Plaintiff met with Dr. Hesse again.

According to Dr. Hesse's report, Plaintiff "describe[d] her mood as largely stable with a tendency for

anxious and depressive feelings at times," and she "denie[d] agitation [or] acute depression."  (Id. at

618-19.)  Dr. Hesse noted that, "[b]y history and presentation, the patient is relatively stable without

acute signs or symptoms of mood difficulties."  (Id. at 619)

On February 4, 2013, Ms. Lutkus completed a Mental Impairment Questionnaire (the

"Questionnaire") that Dr. Hesse co-signed.  The Questionnaire stated that Plaintiff "has made little

progress and many symptoms have worsened over time."  (Id. at 632.)  Under "prognosis," the

Questionnaire reiterated that Plaintiff's symptoms have worsened over time and indicated that

Plaintiff "may require a higher level of care in the near future if they continue to deteriorate."  (Id.)

On the issue of physical symptoms, the Questionnaire stated that Plaintiff's "depression/anxiety and obsessive worries make it hard to ignore [the] physical pain she experiences, which in turn worsens mental health, and so on and so forth." (Id. at 634.) The Questionnaire indicated that Plaintiff has "marked" difficulties in maintaining social functioning and has suffered "one or two" episodes of decompensation within the past 12 months. (Id.) According to the Questionnaire, Plaintiff's symptoms have caused "more than a minimal limitation of ability to do any basic work activity," and "even a minimal increase in mental demands or change in the environment would be predicted to cause [Plaintiff] to decompensate." (Id. at 634-35.) The Questionnaire anticipated that Plaintiff's impairments or treatment would cause her to be absent from work more than four days a month. (Id. at 635.) Finally, the Questionnaire concluded by stating that "[Plaintiff's] mental worry/obsession coupled with her depressed and anxious symptoms would make it extremely unlikely that she could function in a useful way at a job at this time." (Id.)

B. Testimony Before the ALJ

After the denial of Plaintiff's applications for SSI and SSDI benefits, the hearing before the ALJ took place on February 12, 2013, and both Plaintiff and vocational expert ("VE") Erin Bailey testified. (Id. at 33-60.) At the hearing, Plaintiff explained that she stopped working as a candle maker in February, 2009 because of pain in both wrists due to De Quervain's tenosynovitis and carpal tunnel syndrome, for which she has received surgical treatment and physical therapy. (Id. at 37-39.) Turning to the subject of mental health, Plaintiff testified she has been receiving treatment for her mental health ailments, including depression and anxiety, for a number of years. (Id. at 39-41.) When asked by the ALJ if the treatment was helping, Plaintiff stated it helped "to a point," but indicated "the depression and the anxiety and everything is still very high." (Id. at 40-41.) Plaintiff described her symptoms as having "[n]o ambition to do anything, no desire." (Id. at 49.) She testified these symptoms became worse after she stopped drinking alcohol in 2010. (Id.) Plaintiff

also testified that her depression makes it difficult to get out of bed, and that she "won't get out of the bed" two or three days a week.  (Id. at 42-43, 54.)  Describing her anxiety symptoms, Plaintiff testified that "the anxiety is just always there" and being out of the house for extended times or being around crowds is difficult.  (Id. at 49-50.)  Plaintiff related that she cooks and cleans around the house she shares with her father, to the extent she feels able to do so on a given day based on her physical and mental symptoms.  (Id. at 41-42.)  She further testified that her girlfriends will occasionally get her to leave the house, but she feels worse when she returns home.  (Id. at 42.)  Plaintiff also stated her obsessive-compulsive symptoms interfere with daily activities, such as grocery shopping, and that she continued to have trouble sleeping.  (Id. at 50-53.)  Summing up the effects of her mental health impairments, Plaintiff testified that, while she has good days and bad days, the balance is "probably more bad than good."  (Id. at 56.)

Following the conclusion of Plaintiff's testimony, the ALJ asked the VE to discuss a hypothetical individual with Plaintiff's age, education, and past work experience who has occasional limitations in lifting objects, is limited to unskilled and simple tasks, must work in a low-stress environment, and is limited to occasional interaction with the public.  (Id. at 58.)  The VE testified that such an individual could not perform Plaintiff's past work, but could perform other jobs, such as a security system monitor or a ticket checker, each of which are jobs that exist in significant numbers in the national economy.  (Id. at 59.)

C.  The ALJ's Decision

The ALJ issued a decision on March 19, 2013, finding Plaintiff was not disabled from February 9, 2009 through the date of that decision.  (Id. at 13-27.)  Thereafter, the Appeals Council of the Social Security Administration declined to review the ALJ's decision, which, as a result, became final.  (Id. at 1-6).  Plaintiff then filed the instant action, the Commissioner compiled the administrative record, and the parties submitted the cross-motions presently at issue.

III.      STANDARD OF REVIEW

The role of a district court reviewing an administrative law judge's decision is limited to

determining whether the conclusion was supported by substantial evidence and based on the correct

legal standard.  See 42 U.S.C. §§ 405(g) and 1383(c)(3); Manso-Pizarro v. Sec'y of Health & Human

Servs., 76 F.3d 15, 16 (1st Cir. 1996).  The Supreme Court has defined substantial evidence as "more

than a mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co.

v. NLRB, 305 U.S. 197, 229 (1938)).  Even if the administrative record could support multiple

conclusions, a court must uphold the Commissioner's findings "if a reasonable mind, reviewing the

evidence in the record as a whole, could accept it as adequate to support his conclusion."  Ortiz v.

Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (quoting Rodriguez v. Sec'y of

Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  Additionally, it is the Commissioner's

responsibility to weigh conflicting evidence and decide issues of credibility.  Rodriguez, 647 F.2d at

222.

IV.      DISABILITY STANDARD AND THE ALJ'S DECISION

Entitlement to SSI requires a showing of both disability and financial need on or after the

date of the SSI application.  See 42 U.S.C. § 1381a.  Here, Plaintiff's financial need is not challenged.

An individual is entitled to SSDI benefits if, among other things, she has an insured status and, prior

to the expiration of that status, she was under a disability.  See Baez v. Astrue, 550 F. Supp. 2d 210,

214 (D. Mass. 2008) (citing 42 U.S.C. § 423(a)(1)(A) and (E)).  The ALJ determined that Plaintiff

meets the insured status requirements for SSDI benefits.  (A.R. at 15.)  Therefore, whether Plaintiff

has a disability is the only issue with respect to both the SSI and SSDI benefits claims.

The Social Security Act (the "Act") defines disability, in part, as the inability "to engage in

any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last

8

for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A) and

1382c(a)(3)(A). An individual is considered disabled under the Act:

> only if his physical or mental impairment or impairments are of such severity that he
> is not only unable to do his previous work but cannot, considering his age, education,
> and work experience, engage in any other kind of substantial gainful work which exists
> in the national economy, regardless of whether such work exists in the immediate area
> in which he lives, or whether a specific job vacancy exists for him, or whether he would
> be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). See generally Bowen v. Yuckert, 482 U.S. 137, 146-49

(1987).

In determining disability, the Commissioner follows the five-step protocol described by the

First Circuit as follows:

> 1) if the applicant is engaged in substantial gainful work activity, the application is
> denied; 2) if the applicant does not have, or has not had within the relevant time period,
> a severe impairment or combination of impairments, the application is denied; 3) if
> the impairment meets the conditions for one of the "listed" impairments in the Social
> Security regulations, then the application is granted; 4) if the applicant's "residual
> functional capacity" is such that he or she can still perform past relevant work, then
> the application is denied; 5) if the applicant, given his or her residual functional
> capacity, education, work experience, and age, is unable to do any other work, the
> application is granted.

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001); see also 20 C.F.R. §§ 404.1520(a)(4) and

416.920(a)(4).

In the instant case, the ALJ found as follows with respect to these steps. First, Plaintiff has

not engaged in substantial gainful activity since February 9, 2009, the alleged onset date of her

disability, through the ALJ's decision on March 19, 2013. (A.R. at 15.) Second, the ALJ found

Plaintiff has severe impairments, in particular, depression, anxiety, and a history of alcohol and

cannabis abuse (in remission). (Id.) Third, the ALJ determined Plaintiff's impairments did not,

singly or in combination, meet or medically equal the severity of one of the impairments listed in 20

C.F.R. Part 404, Subpart P, Appendix 1. (Id. at 16.) The ALJ then evaluated Plaintiff's residual

functional capacity ("RFC") and found that Plaintiff has the RFC to perform sedentary work.  (Id. at

17.)  The ALJ noted certain physical limitations on Plaintiff and also determined:

> [a]s a result of her mental impairments, [Plaintiff] is limited to unskilled work and
> simple, routine, repetitive, one to two-step tasks.  She is limited to low stress work,
> defined as only occasional decision making required and occasional changes in the
> work setting.  [Plaintiff] is limited to work[] with only occasional judgment required
> on the job, and only occasional interaction with the public.

(Id. at 17-18.)  In light of this RFC, the ALJ found at the fourth step that Plaintiff is unable to

perform any past relevant work.  (Id. at 25.)  At the fifth and final step, the ALJ determined that

Plaintiff could engage in other work in representative occupations such as a surveillance system

monitor or a ticket checker, which are jobs that exist in significant numbers in the national economy.

(Id. at 26.)  As a result, the ALJ determined Plaintiff was not disabled. (Id. at 26-27.)

## V.  ANALYSIS

Plaintiff asserts that the ALJ erred because she "did not fully evaluate the opinion" of Ms.

Lutkus and Dr. Hesse regarding Plaintiff's mental health when determining Plaintiff's RFC.  In

response, the Commissioner argues that these opinions were given "appropriate consideration" and

substantial evidence in the record supports the ALJ's findings.  Viewing the record as a whole, the

court agrees with the Commissioner.

An administrative law judge must give "controlling weight" to the medical opinion of a

"treating source" if it is "well-supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with the other substantial evidence" in the record.  20 C.F.R. §§

404.1527(c)(2) and 416.927(c)(2).  When an administrative law judge does not accord a treating

source's medical opinion controlling weight, he or she must consider the length, frequency, nature,

and extent of the treatment relationship, the opinion's supportability and consistency with the

record as a whole, and any other relevant factors to determine the weight the opinion deserves.  20

C.F.R. §§ 404.1527(c)(2)-(6) and 416.927(c)(2)-(6).  The administrative law judge must also give

"good reasons" for the weight ultimately given to such an opinion.  20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2).

Plaintiff characterizes Ms. Lutkus and Dr. Hesse as her "treating mental health sources." The implication seems to be that the opinions of Ms. Lutkus and Dr. Hesse deserve controlling weight under the above regulations.  Dr. Hesse fits the definition of a "treating source," namely, an "acceptable medical source" who provided a patient with medical treatment and evaluation and had an ongoing relationship with such patient.  20 C.F.R. §§ 404.1502 and 416.902.  The record contains two case notes that he rendered, which would be eligible for controlling weight if they are well-supported and consistent with the rest of the evidence.  Ms. Lutkus does not fit the definition of a "treating source" because a licensed independent clinical social worker is not among the "acceptable medical sources" listed in 20 C.F.R. §§ 404.1513(a) and 416.913(a).  See also Randall v. Astrue, 2011 WL 2649967, at *1 (D. Mass. July 5, 2011).  Thus, her case notes, which constitute the majority of the evidence upon which Plaintiff relies, would not be entitled to controlling weight under the regulations.  The February 4, 2013 Questionnaire was drafted by Ms. Lutkus and co-signed by Dr. Hesse and may therefore be eligible for controlling weight if the supportability and consistency requirements are met, a point which the Commissioner appears to concede.

It is clear, however, the ALJ considered the opinions of Ms. Lutkus and Dr. Hesse and gave them appropriate weight.  With respect to Dr. Hesse, while the Questionnaire opined that Plaintiff's symptoms were worsening, the ALJ found this assessment was inconsistent with Dr. Hesse's "own office notes."  (A.R. at 25.)  Dr. Hesse's notes can certainly be read to paint a different picture than the Questionnaire.  For example, his initial notes from November 19, 2012 indicated that Plaintiff suffered from symptoms of "moderate to mild depression," and his notes from January 11, 2013 reported that Plaintiff was "relatively stable without acute signs or symptoms of mood difficulties." (Id. at 619, 627.)  The contents of Dr. Hesse's reports therefore provide sufficient support for the

ALJ's finding that Dr. Hesse's opinion in the Questionnaire failed to meet the requirements of consistency and supportability demanded by 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2), and was therefore not entitled to controlling weight.  While the ALJ did not extensively explain why Dr. Hesse's opinion was not given controlling weight, Dr. Hesse's statements and conclusions outside of the Questionnaire provide little, if any, support for Plaintiff's claim.  In the end, the inconsistency identified by the ALJ between the Questionnaire and Dr. Hesse's notes, in addition to the body of evidence as a whole, is adequate to support the decision to give Dr. Hesse's opinion less than controlling weight.

As for Ms. Lutkus, while the Questionnaire she drafted was co-signed by Dr. Hesse, who is an "acceptable medical source" under the regulations, that does not transform Ms. Lutkus into an "acceptable medical source."  Accordingly, since Ms. Lutkus is not an "acceptable medical source" and thus not a "treating source," her opinion is not entitled to controlling weight and the ALJ was not required to give "good reasons" for the weight ultimately assigned.  20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2).  Nevertheless, as an "other medical source" under the regulations, see 20 C.F.R. §§ 404.1513(d) and 416.913(d), the ALJ could not ignore her opinion or fail to adequately explain the weight given to it.  See Taylor v. Astrue, 899 F. Supp. 2d 83, 88 (D. Mass. 2012) (citing SSR 06-03p, available at 2006 WL 2329939, at *3, *5 (2006)).  However, as with Dr. Hesse, the ALJ found that Ms. Lutkus's assertions in the Questionnaire were inconsistent with her own notes.  (A.R. at 25.)  The record provides an adequate basis for the ALJ's determination.  For example, while the Questionnaire opined that Plaintiff's symptoms were worsening, Ms. Lutkus's notes suggest some progress towards Plaintiff's goal of reducing her depression and anxiety symptoms, with Plaintiff having achieved 25% of her goal as of May 21, 2012, compared to the 15% achievement Ms. Lutkus originally noted on November 16, 2010.  (Id. at 330, 556.)  The ALJ also stated that Ms. Lutkus's opinion "appears to rely heavily on the subjective report of symptoms and limitations provided by

[Plaintiff], and the totality of the evidence does not support the opinion." (Id. at 25.)  Additionally, the ALJ found that Ms. Lutkus's opinion "contrasts sharply with the other evidence in the record, which renders it less persuasive." (Id.)  These statements echo Dr. Litchman's and Dr. McGan's views of Ms. Lutkus's conclusions. (Id. at 67-68, 71.)  The findings of Dr. Williams, Dr. Litchman, Dr. McGan, Dr. Derecho, and even Dr. Hesse act as a counterweight against those of Ms. Lutkus. Moreover, while Ms. Lutkus's evaluations indicate a worsening of symptoms taking place after many of the other sources' opinions were rendered, that concern is obviated by the ALJ's explanation of the flaws in Ms. Lutkus's assessments and by the contemporaneous accounts of Dr. Hesse that fail to corroborate Ms. Lutkus's observations.

As the Commissioner points out, Ms. Lutkus's and Dr. Hesse's statements specifically regarding Plaintiff's ability to work are not entitled to any special deference by the ALJ.  The Questionnaire stated that Plaintiff's symptoms "would make it extremely unlikely that she could function in a useful way at a job at this time." (Id. at 635.)  The question of Plaintiff's ability to work is reserved to the ALJ and, while the ALJ must consider medical source opinions in deciding the question, such opinions "are never entitled to controlling weight or special significance" when they relate to issues reserved to the ALJ.  SSR 96-5p, available at 1996 WL 374183, at *2 (1996).  To do otherwise "would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." Id.; see also Foley v. Astrue, 2010 WL 2507773, at *8 (D. Mass. June 17, 2010) ("[T]he opinion of a treating physician that a claimant is unable to work is entitled to no deference at all (as it is not a medical opinion).").

Finally, substantial evidence elsewhere in the record supports the ALJ's ultimate RFC finding.  In particular, the ALJ's decision was also based on the testimony and statements of Plaintiff

herself, with the ALJ asserting that "[a] claimant's credibility is the underpinning of a disability case" and that there were "questions as to [Plaintiff's] credibility" in this case. (A.R. at 23-24.) See Perusse v. Astrue, 2011 WL 1870590, at *5 (D. Mass. Apr. 25, 2011). The ALJ asserted that Plaintiff's "ability to manage a wide range of daily activities belies her allegation of total disability." (A.R. at 24.) An administrative law judge may properly consider "daily activities" when evaluating a claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i) and 416.929(c)(3)(i). Plaintiff testified she is able to cook, clean, go shopping, attend doctor's appointments, and even visit friends, all of which supports the ALJ's determination regarding daily activities. (A.R. at 41-42, 52.) Plaintiff also testified she "feel[s] worse" when she returns home from visiting friends, id. at 42, but, viewing the record as a whole, there is substantial evidence available to support the ALJ's findings.

The ALJ concluded her findings with respect to Plaintiff's RFC by stating that, "with several questions regarding [Plaintiff's] credibility, the need for objective findings to corroborate her assertions was increased and the findings did not support her assertions." (Id. at 25.) It is the ALJ's responsibility to weigh conflicting evidence and decide issues of credibility. See Rodriguez, 647 F.2d at 222. Given the ALJ's credibility determinations, her analysis of the overall record, and her review of the opinions of Ms. Lutkus and Dr. Hesse in particular, "a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support" the ALJ's conclusion. See Ortiz, 955 F.2d at 769. This court must uphold the ALJ's determination if it was supported by substantial evidence, even if the available evidence could have supported other determinations, and even if a different administrative law judge may have reached a different conclusion when reviewing the record. Substantial evidence does support the conclusions reached by the ALJ in this case.

VI.    CONCLUSION

For these reasons, the court DENIES Plaintiff's Motion for Judgment on the Pleadings

(Dkt. No. 12) and ALLOWS Defendant's Motion for Order Affirming the Decision of the

Commissioner (Dkt. No. 20).  The clerk shall enter judgment for Defendant, and this case may now

be closed.

It is So Ordered.

 _/s/ Mark G. Mastroianni_
MARK G. MASTROIANNI
United States District Judge